**WESTWAY TRADING CORPORATION,**
Appellant,

v.

**The UNITED STATES, Appellee.**

**Appeal No. 80–9. C.A.D. No. 1254.**

United States Court of Customs
and Patent Appeals.

Oct. 30, 1980.

Murray Sklaroff, New York City, attorney of record, for appellant.

Alice Daniel, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, New York City, Joseph I. Liebman, Attorney in Charge, Field Office for Customs Litigation, New York City, Saul Davis, Commercial Litigation Branch, New York City, attorneys of record, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER, and NIES, Judges.

MILLER, Judge.

This is an appeal from the judgment of the United States Customs Court, —— Cust.Ct. ——, C.D. 4826, 483 F.Supp. 300 (1979), granting the Government's cross–motion for summary judgment and sustaining its position that sugar imported into the United States by appellant was not exempt from increased duty under item 155.20, TSUS, under Presidential Proclamation 4466 ("PP 4466") issued October 4, 1976, which modified Presidential Proclamation 4463 ("PP 4463") issued September 21, 1976. We affirm.

## BACKGROUND

Increased duty on sugar imported by Westway Trading Corp. ("Westway") was assessed by the Customs Service under PP 4463.[1] Westway claims that its sugar was exempt under PP 4466[2] from the increase. The sugar in question was laded at the port of Salaverry, Peru. The ship departed Salaverry on September 18, 1976, and proceeded to Pimental, Peru, from which it departed for the United States on October 5, 1976. On September 21, 1976, PP 4463 was issued increasing the duty on sugar imported into the United States. However, on October 4, 1976, PP 4466 was issued amending PP 4463 by exempting sugar "exported to the United States before 12:01 A.M. . . . , September 21, 1976."

The Customs Court held that Westway failed to rebut the presumption of correctness attaching to the determination of the District Director of Customs. It stated that by use of the phrase "exported to the United States" the President intended that "exported" be construed as the final act of departing the country of exportation. It based this conclusion on instructions issued on January 24, 1972, by telegram from the Commissioner of Customs ("Commissioner")[3] interpreting Additional Duty Order Number 4 ("ADO–4")[4] and on prior decisions and regulations[5] interpreting the

1. 41 Fed.Reg. 41681 (1976). PP 4463 provides:

B. The rates of duty in rate column numbered 1 for items 155.20 and 155.30 of Subpart A, Part 10, Schedule 1 of the TSUS, are modified, and the following rates are established:
155.20 . . . . . . 1.9875¢ per lb. less 0.028125¢ per lb. for each degree under 100 degrees (and fractions of a degree in proportion) but not less than 1.284375¢ per lb.
155.30 . . . . . Dutiable on total sugars at the rate per lb. applicable under Item 155.20 to sugar testing 100 degrees.
C. The provisions of this proclamation shall become effective . . . on and after the date of this proclamation and shall remain in effect until the President otherwise proclaims or until otherwise superseded by law.

2. 41 Fed.Reg. 44031 (1976); PP 4466 provides:
NOW, THEREFORE, I, GERALD R. FORD, President of the United States of America, . . . [in order to alleviate hardships which may result from increasing the rate of duty with respect to certain goods that were exported prior to the effective date of PP 4463] do hereby proclaim that paragraph C of Proclamation No. 4463 of September 21, 1976, is hereby amended to read as follows:
C. . . . [T]he provisions of this proclamation *shall not be effective with respect to articles exported to the United States before 12:01 A.M.* (U.S. Eastern Daylight Savings Time), *September 21, 1976* . . . . [Emphasis supplied].

3. The Commissioner's telegram of January 24, 1972, stated:
TO ALL REGIONAL COMMISSIONERS, REGIONAL DIRECTORS OF SECURITY AND AUDIT, AND DISTRICT DIRECTORS OF CUSTOMS

Rebuttal January 18, 1972, concerning additional duty order No. 4, the date of exportation of articles exported to the United States on or after October 1, 1971, will be determined in accordance with section 14.3(d) Customs Regulations, including footnote No. 5. You will not repeat not use method authorized in Butel September 3, 1971, for shipments by vessel where goods were laden at multiple ports within a single country.

4. 37 Fed.Reg. 887 (1971). ADO 4 provides:
*Articles Exempt from Additional Duty Imposed Under Subpart C of Part 2 of the Appendix to* the Tariff Schedules of the United States
. . . I hereby determine that it is consistent with safeguarding the balance of payments position of the United States to establish exemptions from the additional duty provided for in subpart C as set forth in Headnote 5 thereof, which I hereby amend as follows:

A new paragraph, designated as paragraph (i), is added reading as follows:
(i) Articles exported to the United States on or after October 1, 1971, irrespective of country of origin, which are described in the textile and apparel categories for wool and man made fibers published in a notice in the Federal Register . . . .

5. 19 CFR 152.1 (1979) provides:
(C) *Date of exportation.*
"*Date of exportation,*" or the "*time of exportation,*" referred *to in sections 402 and* 402a, Tariff Act of 1930, as amended (19 U.S.C. 1401a and 1402), means the actual date merchandise finally leaves the country *of exportation for the United States.*
The predecessor to 19 CFR 152.1(c) was 19 CFR 14.3 (1972), which provided:
(b) The time of exportation referred to in *section 402 and section 402a of the* Tariff

phrase "date of exportation" in customs valuation cases.

## OPINION

Appellant contends that the sugar laded at Salaverry was exported on the date that it left that port and bases its contention on Presidential Proclamation 4074 ("PP 4074"),[6] as modified by Additional Duty Order Number 3 ("ADO–3"),[7] and a Commis-

Act, as amended, is the date on which the merchandise actually leaves the country of exportation for the United States.[5]

[5] If the merchandise is shipped directly by water from the country of export, the date of the sailing of the vessel is the date of exportation. Since the act of exportation is not complete until the merchandise finally leaves the jurisdiction of the exporting country, if a vessel with merchandise on board sails from two or more ports, . . . of the exporting country, . . . the date the vessel on which the merchandise finally leaves the exporting country sails from the last port thereof is the date of exportation. . . .

**6.** 36 Fed.Reg. 15724 (1971). PP 4074 provides:

NOW, THEREFORE, I, RICHARD NIXON, President of the United States of America, . . . [to assure our security by enhancing our international competitive position and to bolster our balance of payments position] do proclaim as follows:

(2) [Prior Presidential] proclamations are suspended only insofar as is required to assess a surcharge in the form of a supplemental duty amounting to 10 percent ad valorem. Such supplemental duty shall be imposed on all dutiable articles imported into the customs territory of the United States from outside thereof, which are entered, or withdrawn from warehouse, for consumption *after 12:01 a. m., August 16, 1971* . . . .

Subpart C-Temporary Modifications for Balance of Payments Purposes
*Subpart C headnotes*:

2. *Additional duties imposed*– . . .
The provisions for these duties are effective with respect to articles entered on and after 12:01 a. m., August 16, 1971, and shall continue in effect until modified or terminated by the President or by the Secretary of the Treasury . . . .

**7.** 36 Fed.Reg. 17667 (1971). ADO–3 provides:
*Articles Exempt from Additional Duty Imported under Subpart C of Part 2 of the Appendix to the Tariff Schedules of the United States*

sioner's telegram of September 3, 1971.[8] It argues that the language "exported to the United States before" a certain date is common to both PP 4074 (as modified by ADO–3) and PP 4466, which was adopted for the purpose of alleviating hardships to importers;[9] that, historically, such language has only been used twice and must have been intended to have the same meaning in both instances. Appellant also asserts that prior

. . . I hereby determine that it is consistent with safeguarding the balance of payments position of the United States to establish exemptions from the additional duty provided for in subpart C as set forth in Headnote 5 thereof which I hereby amend to add the following:

(h) Articles exported to the United States before 12:01 a. m., August 16, 1971, provided that any such articles entered for warehouse or placed in foreign trade zone shall be exempt only if withdrawn from warehouse for consumption or entered or withdrawn for consumption from a foreign trade zone under a request properly filed on or before October 1, 1971.

**8.** The Commissioner's telegram of September 3, 1971, stated:

All Regional Commissioners and District Directors of Customs

In Presidential Proclamation 4074 of August 15, 1971, and Treasury Department Additional Duty Orders issued under that Proclamation, 12:01 a. m. means 12:01 a. m. United ed States Eastern Daylight Savings Time.

For the purpose of determining the date of exportation under the provisions of Headnote 5(h) subpart C of part 2 of the Appendix to TSUS, the rules set forth below shall be followed:
Where goods are exported from the country of exportation by vessel, and where the vessel lades merchandise at 2 or more ports within that country, the date of exportation for each of the shipments shall be the date upon which the shipment left the port at which it was laden. . . .

**9.** The Customs Service indicated that one of the purposes underlying PP 4074 as modified by ADO-3 was "to alleviate a widespread financial hardship to importers whose merchandise had been exported [to the United States] before the surcharge was imposed and thus had no advance notice of the additional duties." PP 4466 expressly states that one of its purposes is "to alleviate hardships which may result from increasing the rate of duty with respect to certain goods that were exported [to the United States] prior to the effective date of [PP 4463]."

decisions interpreting the phrase "date of exportation" involved valuation cases and were unrelated to an expressed desire of the President to alleviate hardship.

The Government adopts the rationale of the Customs Court, relying on the Commissioner's telegram of January 24, 1972, interpreting ADO–4, and customs regulations and decisions interpreting "date of exportation." It underscores the fact that ADO–4 and the Commissioner's interpreting telegram of January 24, 1972, were later in time than ADO–3 and the interpreting telegram of September 3, 1971. It argues that the President would have been aware of the conflict between the interpretations of ADO–3 and ADO–4 and that, in using the language "exported to the United States," he intended the Commissioner's most recent interpretation to apply.

The decisive issue is whether Westway has carried its burden of proving that the determination of the District Director of Customs was not correct. A presumption of correctness attaches to the decision of the Secretary of the Treasury or his delegate, who, in this case, was the District Director of Customs. 28 U.S.C. § 2635(a) (1970); *United States v. Hugo Stinnes Steel & Metals Co.*, 66 CCPA ——, ——, C.A.D. 1226, 599 F.2d 1037, 1042 (1979). The only evidence of Presidential intent cited by Westway is the earlier and unrepeated interpretation of "date of exportation" contained in the September 3, 1971, telegram issued by the Commissioner of Customs. All court decisions, regulations, and the more recent Commissioner's telegram have uniformly interpreted "date of exportation" to mean the date on which

merchandise in issue *finally* leaves the country of exportation, regardless of departures from intermediate ports.

It was reasonable for the District Director of Customs to infer that the President would have been aware that the Commissioner's September 3, 1971, telegram interpreting "exported to the United States before" a certain date in ADO–3 was unique and that the case law,[10] customs regulations,[11] and the Commissioner's more recent telegram interpreting "exported to the United States on or after" a certain date in ADO–4 were inconsistent with that interpretation. Also, we note that the telegram interpreting ADO–4 expressly directed that the method authorized in the telegram of September 3, 1971, for determining date of exportation for shipments where goods are laded at multiple ports within a single country was not to be followed. Accordingly, we conclude that the interpretation given ADO–4, and not that given ADO–3, would have been intended by the President when he promulgated PP 4466.

In view of the foregoing, we hold that Westway failed to carry its burden of proving that the involved sugar was exempt under Presidential Proclamation 4466 from increased duty.

The judgment of the Customs Court is *affirmed.*

**10.** Since the decision in *Froman v. Peaslee*, 9 Fed.Cas. 452 (1857), the courts have consistently determined that merchandise is exported to the United States upon departing from the last port in the jurisdiction of the exporting country. *See D.N. & E. Walter & Co. v. United States*, 42 CCPA 114, C.A.D. 582 (1955); *Avakian Bros., Inc. v. United States*, 41 CCPA 80, C.A.D. 532 (1953). The fact that the cited cases dealt with the determination of "value" does not preclude reference to their interpretation of "exported." In each instance the court is concerned with the definition of a term consistently used in customs law. In addition, this court has approved adopting definitions by analogy to other areas of customs law when necessary to define a term found in a presidential proclamation. *United States v. Hugo Stinnes Steel & Metals Co., supra.*

**11.** *See* note 5, *supra.*